## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PAMELA IRENE HERRING,** | : | **CIVIL ACTION NO. 3:13-CV-00004** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **vs.** | : | |
| | : | |
| **CAROLYN W. COLVIN, ACTING** | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SOCIAL SECURITY,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

## Background

The above-captioned action seeks review of a decision of the Commissioner

of Social Security ("Commissioner") denying Plaintiff Pamela Irene Herring's claim

for social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is

disabled and "insured," that is, the individual has worked long enough and paid

social security taxes. The last date that a claimant meets the requirements of being

insured is commonly referred to as the "date last insured." It is undisputed that

Herring met the insured status requirements of the Social Security Act through

December 31, 2008. Tr. 83, 85, 208, 223 and 260.[1] In order to establish entitlement

to disability insurance benefits Herring was required to establish that she suffered

---

[1] References to "Tr.\_" are to pages of the administrative record filed by the
Defendant as part of the Answer on March 7, 2013.

from a disability on or before December 31, 2008.  42 U.S.C. §423(a)(1)(A), (c)(1)(B);

20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Herring protectively filed[1] her application for disability insurance benefits on

January 20, 2009. Tr. 83, 192-195 and 215.  In her application Herring alleges that

she became disabled on September 30, 2003. Tr. 83 and 192 and 208. On July 15,

2009, the Bureau of Disability Determination[2] denied Herring's application. Tr. 163-

167. On August 13, 2009, Herring filed a request for a hearing before an

administrative law judge. Tr. 83 and 171-172.  The request was granted and a

hearing was held on October 27, 2010. Tr. 83 and 98-121.  Herring was represented

by counsel at the hearing. Id.  On November 22, 2010, the administrative law judge

issued a decision denying Herring's application. Tr. 83-93.  The administrative law

judge found that Herring failed to prove that she met the requirements of a listed

impairment or suffered from work-preclusive functional limitations on or before the

date last insured. Tr. 86-92.  On January 7, 2011, Herring filed a request for review

with the Appeals Council.  On July 12, 2012, the Appeals Council concluded that

there was no basis upon which to grant Herring's request for review. Tr. 1-6 and 79.

Herring filed the instant complaint in this court on January 2, 2013.

---

[1]A protective filing occurs when an individual initially contacts the Social
Security Administration to file a claim for benefits and requests an expedited filing
date. Simply stated, it allows an individual to have an application date based upon
the date of his or her first contact with the Administration.

[2]The Bureau of Disability Determination is an agency of the state which
initially evaluates applications for disability insurance benefits on behalf of the
Social Security Administration.  Tr. 164.

Herring  was born in the United States on December 26, 1971, and at all times relevant to this matter was considered a "younger individual"[3] whose age would not significantly impact her ability to adjust to other work. 20 C.F.R. § 404.1563(c); Tr. 192, 215 and 223.  Herring graduated from high school in 1990 and can read, write, and converse in English and perform basic mathematical functions. Tr. 218, 233 and 253.  During her elementary and secondary schooling, Herring attended regular education classes. Tr. 239.  After graduating from high school, Herring successfully completed a one-year nursing program and became a licensed practical nurse in 1992. Tr. 218 and 239. Herring worked as a licensed practical nurse from June, 1992 until September, 2003. Tr. 241.

Herring's work history covers 13 years and at least 4 different employers. Tr. 209-212 and 241.  The records of the Social Security Administration reveal that Herring had earnings in the years 1990, 1992 through 1997, and 1999 through 2004. Tr. 209.  Herring's annual earnings range from a low of $178.13 in 2004 to a high of $23,327.17 in 1995. Id.  The sum of Herring's  earnings during those 13 years is $140,127.66. Id.   A vocational expert identified Herring's past relevant employment[4]

---

[3]The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

[4]Past relevant employment in the present case means work performed by Herring during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant work, the work must also amount to substantial gainful activity. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.

as a licensed practical nurse which the vocational expert described as skilled,

medium work.[5] Tr. 115.

———————————

[5]The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as  loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

Herring claims that she is unable to work because of injuries she sustained on September 24, 2003, when a resident of the retirement home where she worked grabbed and twisted her right arm. Tr. 105, 234, 258 and 549.  As a result of that work-related injury Herring received worker's compensation benefits from 2003 through the end of 2008 when her case settled, at which point she filed for disability insurance benefits. Tr. 102 and 192.  Herring initially claimed that she was disabled because of the injury to her right upper extremity. Tr. 234.  In addition, Herring claims that she suffered from degenerative disc disease of the lumbar spine which prevents her from engaging in any gainful employment. Tr. 258 and  264-269.  At the hearing, Herring testified that she had an achy back for years, but it became disabling in April, 2009. Tr. 106.  Herring testified that her initial basis for seeking disability was the injury to her right hand.  Id.  Herring further stated that it is her back problems which arose after the date last insured that causes the overwhelming majority of her current problems. Tr. 120.

Herring is married and lives with her husband and two children, ages 4 and 12;  she is able to take care of her personal needs, such as feeding herself, brushing her teeth, showering and dressing; she is able to grasp a pen and write; and she has

---

(e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

2 C.F.R. § 404.1567.

a driver's license and stated that she is able to drive short distances. Tr. 104, 108

and 111.  Herring  is left-handed. She testified that she has experienced involuntary

movements in her right hand, causing her thumb to twitch toward her palm two to

three times per day; she has had pain in her right wrist and fingers, and a shocking

sensation up her forearm about twice per day;  she can grasp a pen and write with

her right hand; she has difficulty grasping items like milk cartons with her right

hand, but she can grasp a beverage container that has a handle; and she sometimes

experiences a feeling of "pins and needles" in the fingers of her right hand, which

makes it difficult to feel and pick up objects . Tr. 106-110.

In a nine-page handwritten document completed in neat, legible handwriting

on May 15, 2009, and submitted to the Social Security Administration, Herring

stated that she wakes at 7:00 a.m, prepares her daughter for school, dresses her

young son and changes his diapers, and then drives her daughter to school and

meets her father for coffee.  Tr. 249-257.  Herring takes her dog out throughout the

course of a day, and sometimes taker her sister's dogs out as well. Tr. 249-50.  While

her daughter is at school, she cares for her son and sometimes shops for groceries.

Tr. 249. Herring picks her daughter up from school, helps her with her homework,

cooks dinner, does the dishes, and makes lunches for the next day. Tr. 249-250.

Herring helps wash her daughter's hair, does laundry, and has no problem

maintaining her personal care and hygiene. Tr. 251.  Herring stated that she had

difficulty using buttons, handling coins, and using a curling iron because of her

right hand symptoms, and her husband helped her by carrying the laundry basket.
Tr. 251.

Herring worked for a brief period in 2004 but that work was described by the
administrative law judge in his decision as an unsuccessful work attempt and that it
did not amount to substantial gainful activity. Tr. 85.

The relevant time period in this case for assessing whether substantial
evidence supports the administrative law judge's decision is September 30, 2003,
Herring's alleged disability onset date, until December 31, 2008, when her insured
status expired.  Herring was required to establish that she met the requirements of
a listed impairment or suffered from physical functional impairments on or before
December 31, 2008, which prevented her from engaging in full-time work.

**I.      <u>Standard of Review</u>**

When considering a social security appeal, we have plenary review of all legal
issues decided by the Commissioner.  <u>See</u> <u>Poulos v. Commissioner of Social</u>
<u>Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec.</u>
<u>Admin.</u>,  181 F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858
(3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant
to 42 U.S.C. § 405(g) is to determine whether those findings are supported by
"substantial evidence."  <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988);
<u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are
supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v.</u>
<u>Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are

supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.").

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which

8

evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## II.   <u>Sequential Evaluation Process</u>

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  <u>See</u> 20 C.F.R. §404.1520; <u>Poulos</u>, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in

sequence, whether a claimant (1) is engaging in substantial gainful activity,[6] (2) has

an impairment that is severe or a combination of impairments that is severe,[7] (3)

has an impairment or combination of impairments that meets or equals the

requirements of a listed impairment,[8] (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

---

[6]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

[7]The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant's performance of basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

[8]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[9]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## III.  Medical Records

Before we address the administrative law judge's decision and the arguments of counsel, we will review Herring's pertinent medical records.

On September 24, 2003, Herring was treated at the emergency department of the Pottsville Hospital and Warne Clinic, Pottsville, Pennsylvania, for complaints of right arm pain, hand pain and swelling and numbness of the fingers. Tr. 307.  The impetus for her difficulty was an incident at work where a nursing home resident "grabbed and twisted her right arm." Id.   Upon examination it was noted that Herring had "good peripheral pulses, good capillary refill" and "[n]o obvious

---

[9]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

deformity or swelling." <u>Id.</u>   Herring had no complaints other than with respect to her right upper extremity. <u>Id.</u>  The results of a physical examination were normal except "the arm revealed marked pain on pronation and supination[.]"[10] <u>Id.</u> Herring had normal range of motion of the right upper extremity and normal grip strength. <u>Id.</u>   An x-ray of the wrist did not reveal a fracture. Tr. 309.  The diagnostic impression was that Herring suffered from a "[s]train/sprain of [the] right forearm." Tr. 307.  A Velcro splint was applied to Herring's right hand and she was advised to take the nonsteroidal anti-inflammatory drug Naprosyn for pain. <u>Id.</u>

On September 25, 2003, Bruno Schettini, M.D., a physician at Good Samaritan Regional Medical Center, Pottsville, advised that Herring could return to work without restrictions other than wearing the splint and taping the 3rd and 4th fingers of the right hand. Tr. 298.  On September 30, 2003, Dr. Schettini advised that

---

[10]If you hold the arms straight and level at your side with the fingers extended and the thumb pointed upward, supination is turning the arms so that the palms are facing upward.   Pronation is the opposite of supination, the palms are turned downward.

because of a possible non-displaced scaphoid[11] fracture that Herring should avoid or limit her use of the right hand and wear a splint. Tr. 300.

On October 2, 2003, Thomas B. Wheeler, M.D., also a physician at Good Samaritan Regional Medical Center, recommended that Herring not work from October 2, 2003 through November 14, 2003. Tr. 301.  However, on October 6, 2003, Dr. Schettini advised that Herring could engage in "modified duty" if she avoided or limited her use of the right arm and hand. Tr. 299.  On October 11, 2003, Dr. Wheeler prescribed occupational therapy (OT) for "[status post] scaphoid [fracture], superficial branch radial nerve [illegible]." Tr. 303.   X-rays of Herring's right wrist taken on November 13, 2003, and December 9, 2003, revealed no obvious fractures. Tr. 31–311. The x-ray of November 13th did reveal a "transverse lucency extending through the waist of the scaphoid bone, on only one view" and was interpreted as possibly representing a nondisplaced fracture. Tr. 310.  However, the "transverse lucency" did not appear on the December 9th x-ray. Tr. 311.   An x-ray on January 6,

---

[11]There are two lower arm bones, the radius and the ulna.  When the arms are at the sides of the body with palms facing forward, the radius is the bone farthest from the center of the body and above the thumb; the ulna is the bone closest to the center of the body and above the little finger. The distal radius is the portion closest to the wrist. The scaphoid bone is one of the eight carpal bones of the wrist on the thumb side. It is located next to the distal radius. See, generally, Relevant Wrist Anatomy, joint-pain-expert.net,http://www.joint-pain-expert.net/ wrist-anatomy.html (Last accessed March 14, 2014); Anatomy of the Hand and Wrist, HealthPages.org, http://www.healthpages.org/anatomy-function /anatomy-hand-wrist/ (Last accessed March 14, 2014).

2004, did, however, reveal "a sclerotic[12] line consistent with [a] healing . . . fracture through the waist of the [thumb]" and "mild degenerative joint disease involving the 1st metacarpal-carpal joint space." Tr. 312.

On January 23, 2004, Herring was examined by Rajnish P. Chaudhry, M.D., a neurologist, located in Pottsville. Tr. 370-371.  The only abnormal finding was that she had a positive bilateral Tinel's sign at the wrists.[13] Id.  After performing an electromyogram (EMG) and nerve conduction studies, Dr. Chaundry diagnosed Herring as suffering from "paresthesias[14] of the hands with normal electrodiagnostic studies." Tr. 371.

On April 19, 2004, Herring had an appointment with Robert W. Mauthe, M.D., a physiatrist, located in Quakertown, Pennsylvania, for a second opinion regarding her right wrist pain. Tr. 549.  In reviewing Herring's medical history in the report of this appointment Dr. Mauthe stated as follows:

> The patient was initially seen by Dr. Schettini at Good Samaritan
> Hospital and was referred to Dr. Wheeler.  First, she had a temporary
> splint and then a long arm cast, followed by a short arm cast.  She then
> went for physical therapy.  She started developing some numbness

---

[12]Sclerotic is defined as "hard, or hardening; affected with sclerosis." Dorland's Illustrated Medical Dictionary, 1681 (32nd Ed. 2012).

[13]A positive Tinel's sign suggests an irritated nerve. It is a test for carpal tunnel syndrome. Carpal Tunnel Syndrome, About.com Orthopedics, http://orthopedics.about.com/cs/carpaltunnel/ a/carpaltunnel_2.htm (Last accessed March 14, 2014).

[14]Paresthesia is defined as "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." Dorland's Illustrated Medical Dictionary, 1383 (32nd Ed. 2012).

and tingling in the first three digits of the right hand.  She went back
to work for one day and has not worked since.  At this time, her chief
complaint is right wrist pain with numbness and tingling in the first
three digits of the right hand.  She had an EMG which was read as
negative.

Id.  A physical examination revealed that Herring had "no atrophy;" Tinel's sign

"was equivocal at the right wrist" and "markedly positive" at the left wrist;

Herring's sensory examination was normal; Herring had pain over the anatomic

snuffbox;[15] she had slight decreased dorsiflexion;[16] grip strength was reduced with

respect to two settings; and she had some tenderness in the musculature of the

right forearm and diffuse tenderness at the left wrist.  Id.  Dr. Mauthe's diagnostic

impression was that Herring suffered from a right scaphoid fracture. Id.  Dr.

Mauthe ordered a bone scan and an MRI of the right wrist and contemplated a

repeat EMG depending on the outcome of the bone scan and MRI.  Id.  The bone

scan was performed on April 27, 2004, and revealed "mild increased activity in the

region of the distal radius" but was otherwise unremarkable and the MRI revealed

---

[15]The anatomic snuffbox is "[a] hollow seen on the radial aspect (the
thumbside) of the dorsum (the back) of the wrist when the thumb is extended fully.
The reason that it is called the anatomic snuffbox is that snuff (powdered tobacco)
could be put there and then inhaled." Definition of Anatomic snuffbox,
MedicineNet.com, http://www.medterms.com/script/
main/art.asp?articlekey=13291(Last accessed March 14, 2014).  The snuffbox is an
indentation easily felt at the base of the thumb at the distal portion of the radius.

[16]When the hand is palm down on a desk, dorsiflexion is the movement of the
wrist so that the fingers are moved in an upward direction.

no evidence of fracture, osteonecrosis (bone death caused by poor blood supply) or other active bone process. Tr. 313 and 400.

On May 4, 2004, Herring underwent an evaluation of her physical capabilities by L. Bednarz, M.D. Tr. 314. Dr. Bednarz opined that Herring could perform light work. Id.  Herring had no standing, walking, sitting or driving restrictions. Id.  Dr. Bednarz also found that Herring could use her left hand for single grasping, fine manipulation, and pushing/pulling. Tr. 315. Dr. Bednarz did not specify Herring's ability to use her right hand. Id. Dr. Bednarz stated that  Herring could continuously bend, squat, twist, and reach, and she could occasionally climb. Id. Dr. Bednarz concluded that Herring could not only work full-time, but she could even work overtime if she desired.  Id.

On June 3, 2004, Herring underwent electrodiagnostic testing of the right upper extremity which revealed "some mild [carpal tunnel syndrome]" and she was referred to a hand surgeon by Dr. Mauthe. Tr. 547.  On August 10, 2004, Herring was evaluated regarding her complaints of hand and wrist pain at Good Samaritan Regional Medical Center by Scarlett Lichtenwalner, a certified registered nurse practitioner. Tr. 395-396.  A physical examination revealed that with respect to the right upper extremity Herring had decreased range of motion at the wrist; decreased strength in the thumb, index and middle finger; tenderness in the medial wrist area; and decreased wrist dorsiflexion. Tr. 396.  With respect to the left upper extremity, Herring had "a positive Tinel's sign on the [] wrist."  CRNP Lichtenwalner's diagnostic impression was that Herring suffered from "[p]ain

16

consistent with peripheral neuralgia."[17] Id.  Herring was prescribed a Lidoderm

Patch to be applied to the wrist area and the drugs Pamelor and Relafen[18] and it

was noted that  a follow-up appointment would be scheduled in four to six weeks.

Id.

On September 2, 2004, Herring had an appointment with Dr. Mauthe

regarding hand pain.  Tr. 544-545.  After conducting a clinical interview and a

physical examination, Dr. Mauthe in a letter to Bruce D. Nicholson, M.D., another

physician treating Herring, stated as follows:

> The patient is frustrated because no one has been able to give her a
> good explanation for her pain.  To me, it simply appears that she had a
> fracture and she still has posttraumatic pain. She has not been felt to
> be a surgical candidate.  I do not think there is any complex regional
> pain, and for those reasons, I am going to continue conservative care.
> I have allowed her to work as long as she does not do any forceful
> repetitive use of the right hand.  I have recommended she get back
> into a therapy program and try to rehabilitate this as recommended by
> Dr. Bednarz.  I placed her on Mobic for pain and stopped Relafen as it
> was of no benefit. . . .  I think her prognosis is good.  She should
> recover from this. . . .

Tr. 545.  Dr. Mauthe scheduled a follow-up appointment for the month of October.

---

[17]Neuralgia is defined as recurring "pain which extends along the course of one or more nerves. Many varieties of neuralgia are distinguished according to the part affected[.]" Dorland's Illustrated Medical Dictionary, 1262 (32nd  Ed. 2012).

[18]Relafen is a nonsteroid anti-inflammatory drug.  Relafen, Drugs.com, http://www.drugs.com/relafen.html (Last accessed March 14, 2014).  Pamelor is a tricyclic antidepressant used to treat symptoms of depression but also used for other purposes, including chronic nerve pain. What is Pamelor Used For?, eMedTV, http://depression.emedtv.com/pamelor/what-is-pamelor-used-for-p2.html (Last accessed March 14, 2014).

At the follow-up appointment with Dr. Mauthe which was held on October 15, 2004, Dr. Mauthe af1ter conducting a physical examination noted that Herring's grip strength had improved; she had a positive Tinel's sign over her right carpal tunnel; she had pain with palpation over the anatomic snuffbox; and she had a mildly positive Finkelstein test.[19] Tr. 543.   Dr. Mauthe's diagnostic impression was that Herring suffered merely from right wrist pain.  Id.   Dr. Mauthe ordered a repeat EMG and advised Herring to continue physical therapy and take the nonsteroidal anti-inflammatory drug Mobic.   Id.  Dr. Mauthe again noted that Herring could work but not at "full duty at this time."  Id.

During September, October and November, 2004, Herring attended physical therapy sessions at Central PA Rehabilitation Services, Inc. Tr. 316-369.   Her last session was November 23, 2004, and she was discharged from physical therapy on November 24, 2004. Tr. 361.  According to the discharge summary, Herring was discharged at the request of her physician and because she was "getting surgery." Id.

---

[19] De Quervain's tenosynovitis "is a painful condition affecting the tendons on the thumb side of [the] wrist . . . any activity that relies on repetitive hand or wrist movement . . . can make it worse."  Diseases and Conditions, De Quervain's tenosynovitis, MayoClinic, http://www.mayoclinic.org/diseases-conditions/ de-quervains-tenosynovitis/basics/definition/CON-20027238 (Last accessed March 14, 2014).  The Finkelstein test is one used by physicians to confirm de Quervain's tenosynovitis.  The thumb is bent down along the palm and then covered with the other fingers.  If pain is elicited, the patient is likely to have de Quervain's tenosynovitis. Diseases and Conditions, Finkelstein test, MayoClinic, http://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/ multimedia/finkelstein-test/img-20005987 (Last accessed March 14, 2014).

On November 24, 2004, Dr. Mauthe conducted a physical examination of Herring and an EMG of her right upper extremity. Tr. 538-539.  The physical examination revealed tenderness and some slight erythema[20] over the first dorsal compartment, tenderness over the anatomic snuffbox, a positive Finkelstein test, an equivocal sensory examination, and negative Tinel's test over the wrist and elbow. Tr. 538.  Herring's grip strength remained unchanged from the last visit. Id.  EMG study was normal.  Id.  Dr. Mauthe in a letter to Robert X. Murphy, M.D., a surgeon, opined that Herring's problems with her hand were "most likely secondary to an inflammatory component" and he would defer surgical issues to Dr. Murphy. Id.  Dr. Mauthe continued treating Herring with medications and "stopped her physical therapy because the therapist felt that she had reached maximum medical improvement." Tr. 538-539.

On December 21, 2004, Herring underwent surgery of the right hand (a release of the first extensor compartment and the A1 pulley of her right thumb) which was performed by Dr. Murphy. Tr. 379.

On January 11, 2005, Herring was examined by Dr. Mauthe who observed that the surgical incision was healing but there was still some tenderness at the surgical site; there was slight swelling over the right wrist;  Tinel's testing at the right wrist was equivocal; and there was no sensory loss. Id.  Dr. Mauthe noted that

---

[20]Erythema is defined as "redness of the skin produced by congestion of the capillaries," which may result from a variety of causes. Dorland's Illustrated Medical Dictionary, 643 (32nd Ed. 2012).

Herring would "continue with her therapy and hopefully make a full recovery." Tr. 536.

Herring had appointments with Dr. Mauthe on February 22 and April 12, 2005. Tr. 534-535.   Dr. Mauthe noted that Herring's right hand continued to improve.  Id.  On April 26, 2005, Herring underwent a bone scan of the hands and wrists. Tr. 401.  The results were "unremarkable." Id.

On April 27, 2005, Herring underwent a functional capacity assessment by Amy S. Williams, a registered and licensed occupational therapist. Tr. 402-411. Ms. Williams indicated that, based on Herring's performance, Herring could perform sedentary to light work. Tr. 402.  Herring could sit, stand, or walk up to eight hours with regular rest periods. Id.  Herring's grip and pinch strength were consistently weaker on her right hand compared to her left, and she demonstrated decreased coordination with her right hand during assembly/disassembly activities. Id.  Ms. Williams recommended that Herring limit the use of her right hand to five hours per day for 30 minute durations, and avoid activities that require forceful or repetitive motions of the hand and wrist, as well as grasping or pinching. Id. Herring was found to have the ability to occasionally do simple grasping with her right hand and minimal firm grasping and fine grasping. Tr. 405.

Herring attended physical therapy at Central PA Rehabilitation Service, Inc., during January through May, 2005. Tr. 413-515.  On April 18, 2005, Herring was "progressing well with goals of increased [range of motion], improved grip strength, and decreased swelling, along with improved functional ability." Tr. 430.  On

May 18, 2005, Herring was "[p]rogressing with increased wrist [range of motion] and strength, improved grip strength, decreased [soft tissue] dysfunction, and progressive functional ability." Tr. 491.

On May 20, 2005, Dr. Mauthe after examining Herring noted that she was "doing extremely well" and "making continued gains." Tr. 533. He further stated "[t]here is no reason for her to continue the [physical] therapy" because "[s]he can certainly do it on her own." Id. Herring was discharged from the physical therapy program on June 3, 2005, at which time it was noted that she had "increased wrist [range of motion] and strength, improved grip strength, decreased [soft tissue] dysfunction, and progressive functional ability." Tr. 489. On June 16, 2005, Dr. Mauthe after examining Herring noted that Herring was still having pain but that she could continue her home exercise program and needed no further surgery. Tr. 532.

On September 9, 2005, Dr. Mauthe conducted a clinical interview and a physical examination of Herring. He reported that although Herring "may have difficulty working as a [certified nurse assistant] due to transferring patients" she is "certainly [] capable of sedentary to light duty eight hours a day." Tr. 531.

On February 20, 2006, Herring underwent a vocational assessment by Daniel J. Uzak, M.Ed., a certified rehabilitation counselor. Tr. 217-222. Mr. Uzak stated that although Herring was "not able to repetitively do things" with her right hand he would "locate jobs that she is capable of doing in her geographic area[.]" Tr. 222. On March 10 and June 9, 2006, Herring had appointments with Dr. Mauthe. Tr. 529-

21

530.  The only functional restrictions specified by Dr. Mauthe were that Herring

should not engage in forceful or repetitive use of the right upper extremity. Tr. 530.

On September 6, 2006, Dr. Mauthe noted that he agreed with the functional

assessment of Dr. Bednarz  that Herring could perform sedentary to light duty

work. Tr. 528.  Dr. Mauthe stated that Herring had no problems sitting, standing or

walking, but that she had difficulty using her right hand for significant functional

tasks.  Id.  On February 13, 2007, Dr. Mauthe noted that Herring was at maximum

medical improvement and that her restrictions were permanent; he "discharged

her to be seen only as needed." Tr. 527.

On March 31, 2007, Herring visited a chiropractor regarding right elbow and

shoulder pain. Tr. 620-621.  Herring completed a form for the chiropractor in which

she stated that she could perform her daily activities and that she had no arthritis,

neck pain, or low/mid back pain. Id.  Herring reported that her shoulder/elbow

condition made it "harder to hold on to [her] baby." Tr. 621.  When asked whether

there were "any other conditions or symptoms that may be related to her

[shoulder/elbow] symptoms," Herring responding in the negative. Id.  She also

indicated that she had no other "unrelated health problems" that required

evaluation. Id.

The administrative record reveals only three other documents describing

medical care received by Herring prior to her date last insured.  On February 20,

2008, Herring had an appointment with Dr. Mauthe. Tr. 526.  After conducting a

clinical interview and physical examination, Dr. Mauthe reported that there was no

22

change in Herring's limitations. Id.  Herring had a follow-up appointment with Dr.
Mauthe on November 18, 2008. Tr. 525.  Dr. Mauthe's report states that Herring "is
still having pain in the right wrist, difficulty using it for forceful or repetitive tasks, a
little worse now since in the cold weather." Id.  Finally, on December 1, 2008,
Herring underwent an MRI of the right wrist which revealed "[n]o significant
abnormality." Tr. 522.

After the date last insured, Herring did not have a medical appointment with
Dr. Mauthe until February 26, 2009. Tr. 524.  On that date Dr. Mauthe stated that
Herring had a history of hand surgery (right de Quervain's) and very mild carpal
tunnel syndrome.  He further observed that because she did not want injections or
further surgery there was "very little option for her." Id.   Dr. Mauthe prescribed
Voltaren gel[21] and noted that he would see Herring "as needed." Id.  Herring
continued to receive medical care from several different physicians through
September of 2010.  Tr. 516-521, 551-556, 564-565, 567-568, 613-619,  624-639, 642-643,
648-649 and 655-656.

On Monday, April 6, 2009, Herring had an appointment with Edward H.
Lentz, D.O.,  of the Family Practice Center, Lykens, Pennsylvania, regarding lower
back pain which started the week before the appointment. Tr. 554.  When Dr. Lentz
reviewed Herring's symptoms, Herring denied any musculoskeletal problems other

---

[21]Voltaren gel is a topical nonsteroidal anti-inflammatory agent "used to treat
joint pain in the hands, wrists, elbows, knees, ankles or feet caused by
osteoarthritis." Voltaren Gel, Drugs.com, http://www.drugs.com/voltaren-gel.html
(Last accessed March 14, 2014).

than with respect to her lower back.[22] Id.  Notably, she told Dr. Lentz that she

started Tae-Bo kickboxing on Thursday, April 2, 2009. Id.  The results of a physical

examination were essentially normal with the exception of Herring's lower back.

Tr. 555.  During the examination it was observed that Herring was holding a

sleeping child. Id. Dr. Lentz's diagnostic impression was that Herring suffered from

lumbago and he prescribed medications, including the muscle relaxant Flexeril. Id.

An x-ray on April 7, 2009, revealed mild to moderate L5-S1 degenerative disc

disease and possible bilateral sacroiliitis. Tr. 624.

Herring continued to be treated for back pain throughout 2009 and into 2010.

 An MRI of Herring's lumbar spine on May 7, 2009, revealed "[m]ild degenerative

changes at L4-L5 with more significant degenerative changes at L5-S1" and

"[m]oderate bilateral neural foraminal stenosis noted at L5-S1 without additional

neural foraminal stenosis or spinal canal stenosis." Tr. 564-565.  An MRI of

Herring's lumbar spine performed on August 4, 2010, revealed a central disc

herniation at the L5-S1 level with moderate to severe foraminal stenosis; mild to

moderate bilateral foraminal stenosis at the L4-L5 level; and mild left foraminal

stenosis at L3-L4 level. Tr. 648.

On June 30, 2009, Michael J. Brown, D.O. reviewed Herring's medical records

on behalf of the Bureau of Disability Determination and concluded that Herring

---

[22]It appears that Dr. Lentz's physician assistant may have interviewed and examined Herring and that Dr. Lentz merely signed the medical report/notes of the appointment.

had the ability to engage in a limited range of light work. Tr. 569-575.  Dr. Brown's

assessment specifically pertained to Herring's functional abilities on or before

December 31, 2008, the date last insured. Tr. 569.  Dr. Brown found that Herring

could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10

pounds, and could stand, walk, and sit for about 6 hours in an 8-hour workday. Tr.

570.  Dr. Brown stated that Herring had no limitations on her pushing or pulling

abilities other than the weight—which had to be limited to 20 pounds occasionally

and 10 pounds frequently. Id.  Dr. Brown further found that Herring could

occasionally climb, balance, stoop, kneel, crouch and crawl, and that she had no

manipulative, visual, communicative or environmental limitations. Tr. 571-572.

On August 10, 2010, Herring had an appointment with Angela J. Klinger,

D.O., at the Family Practice Center, regarding low back pain. Tr. 625-626.  Dr.

Klinger noted that Herring's MRI of the lumbar spine revealed "pretty significant

disc disease mostly at one level, but causing severe foraminal stenosis." Id.   When

Dr. Klinger reviewed Herring's systems, Herring had no complaints other than with

respect to her lower back. Id.   Herring was referred to William T. Monacci, M.D., a

neurosurgeon who recommended surgery. Tr. 637-639.  The surgery—a bilateral

L5-S1 hemilaminotomy, foraminotomy, partial facetectomy and discectomy for

decompression of the bilateral L5 and S1 nerve roots—was performed on August

25, 2010, by Dr. Monacci. Tr. 642-643.

Herring had a follow-up appointment with Dr. Monacci on September 28,

2010, at which Herring noted some improvement in her symptoms but she

complained of still having 90% of her preoperative symptoms. Tr. 655-656.  Dr.

Monacci observed that Herring was ambulating without difficulty. Id.  A physical

examination of Herring also revealed that she only had a moderate reduction in

range of motion of the lumbar spine; she had negative straight leg raise tests

bilaterally; she had a normal sensory examination of the upper and lower

extremities; she had a negative Tinel's test over the ulnar and median nerves; she

had normal muscle strength and tone in the upper and lower extremities without

atrophy; and she had normal reflexes in the upper and lower extremities. Id.

## IV.   <u>Supplemental Medical Records</u>

After the administrative law judge issued his decision, Herring submitted

additional medical evidence to the Appeals Council. Tr. 7-40 and 47-78.  Those

records reveal examinations of and treatment administered to Herring by several

physicians well after the date last insured.   The Appeals Council denied Herring's

request for review, stating in relevant part regarding the additional evidence:

> We found that this information does not provide a basis for changing
> the Administrative Law Judge's decision.  We also looked at Medical
> records from Dr. Monacci date December 10, 2010 through March 14,
> 2011; medical records from the Family Practice Center date January 4,
> 2011 through January 25, 2012, and imaging studies dated January 4,
> 2011 through January 15, 2011. The Administrative Law Judge decided
> your case through December 31, 2008, the date you were last insured
> for disability benefits. This new information is about a later time.
> Therefore, it does not affect the decision about whether you were
> disabled at the time you were last insured for disability benefits.

Tr. 2.

V.      **Discussion**

The administrative record in this case is 656 pages in length, primarily

consisting of medical and vocational records.  The administrative law judge did an

adequate job of reviewing Herring's medical history and vocational background in

his decision. Tr. 83-93.

Herring argues that the administrative law judge erred by (1) making

contradictory findings concerning the onset and severity of Herring's degenerative

disc disease; (2) failing to include all of Herring's limitations when setting her

residual functional capacity; and (3) failing to consider the new and material

evidence submitted to the Appeals Council. We have thoroughly reviewed the

record in this case and find no merit in Herring's arguments.

The administrative law judge at step one of the sequential evaluation process

found that Herring did not engage in substantial gainful work activity during the

period from her alleged onset date of September 30, 2003, through her date last

insured of December 31, 2008. Tr. 85.

At step two of the sequential evaluation process, the administrative law judge

found that Herring through the date last insured had the following severe

impairments: "de Quervain's syndrome, and carpal tunnel syndrome[.]" Id.

Herring asserts that the ALJ erred by stating there was no evidence that she

suffered from degenerative disc disease prior to the date last insured.  This

argument lacks merit because the ALJ was focusing on the lack of diagnostic tests

prior to December 31, 2008, revealing degenerative disc disease. Tr. 86.  The ALJ

27

acknowledged the existence of an MRI of the lumbar spine performed in May, 2009, *after* the date last insured, which revealed mild degenerative changes at the L4-L5 level with a broad based disc bulge, and a broad based disc bulge at the L5-S1 level without focal herniation but moderate bilateral neural foraminal stenosis. Id. Moreover, the ALJ did not find that there was no medically determinable degenerative disc disease of the lumbar spine prior to the date last insured. Id. To the contrary, the ALG gave Herring the benefit of the doubt, and he included limitations in the residual functional capacity that would adequately account for "any existing degenerative disc disease or related achy back discomfort that [she] may have experienced prior to her date last insured." Id.

At step three of the sequential evaluation process the administrative law judge found that Herring's impairments did not individually or in combination meet or equal a listed impairment. Tr. 86-87.  Herring has not challenged the administrative law judge's step three analysis.

At step four of the sequential evaluation process the administrative law judge found that Herring on or prior to the date last insured had the residual functional capacity to perform a limited range of unskilled to semi-skilled, sedentary work. Tr. 87 and 93.  The administrative law judge found that Herring could perform sedentary work that limited her to only occasional use of her right upper extremity, but did not require forceful or repetitive use of the right hand and right upper extremity; and no more than occasional kneeling, crouching, bending, climbing, crawling or stooping. Tr. 87.

Based on this residual functional capacity and the testimony of a vocational expert the administrative law judge found that Herring could perform unskilled to semi-skilled, sedentary work as a video monitor and as a telephone receptionist or information clerk, and that there were a significant number of such jobs in the local labor market of central Pennsylvania. Tr. 93.

In setting Herring's residual functional capacity, the administrative law judge reviewed the medical records and relied upon several functional assessments which indicated that Herring could engage in sedentary to light work, including the assessments of Dr. Mauthe, Dr. Bednarz and Dr. Brown. Nevertheless, the ALJ gave Herring the benefit of the doubt with respect to certain aspects of her lower back issues, and the ALJ reduced her residual functional capacity to a limited range of sedentary work. Tr. 90-92.

The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c). No treating physician submitted a functional assessment of Herring which indicated that on or prior to the date last insured she was functionally impaired from a physical or mental standpoint for the requisite

continuous 12 month period.[23]  Herring  has proffered no medical opinion, nor has

she marshaled the evidence in the record, to support her contention that on or prior

to the date last insured that she was unable to engage in the limited range of

sedentary work set by the administrative law judge.

The administrative law judge found that Herring's statements about her

functional limitations were not credible to the extent they were inconsistent with

the assessed residual functional capacity. Tr. 88.   When there is a paucity of

objective medical facts supporting a claimant's alleged symptoms, the

administrative law judge has to consider the claimant's credibility.  To the extent

that Herring argues that the administrative law judge did not properly consider her

credibility, the administrative law judge was not required to accept Herring's claims

regarding her physical impairments, particularly with respect to the relevant time

period. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that

credibility determinations as to a claimant's testimony regarding the claimant's

limitations are for the administrative law judge to make).  It is well-established that

"an [administrative law judge's] findings based on the credibility of the applicant

are to be accorded great weight and deference, particularly since [the

administrative law judge] is charged with the duty of observing a witness's

---

[23]To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

demeanor . . . ." <u>Walters v. Commissioner of Social Sec.</u>, 127 f.3d 525, 531 (6th Cir.

1997); <u>see</u> <u>also</u> <u>Casias v. Secretary of Health & Human Servs.</u>, 933 F.2d 799, 801 (10th

Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned

to observe and assess the witness credibility."). Because the administrative law

judge observed and heard Herring testify, the administrative law judge is ~~the one~~

best suited to assess her credibility.

We are satisfied that the administrative law judge appropriately took into

account all of Herring's physical limitations in the residual functional capacity

assessment.

Finally, the supplemental evidence submitted by Herring to the Appeals

Council after the administrative law judge's decision is not a basis to reverse that

decision or remand for further proceedings. Evidence submitted after the

administrative law judge's decision cannot be used to argue that the administrative

law judge's decision is not supported by substantial evidence. <u>Matthews v. Apfel</u>,

239 F.3d 589, 594-595 (3d Cir. 2001). The only purpose for which such evidence can

be considered is to determine whether it provides a basis for remand under

sentence 6 of section 405(g), 42 U.S.C. <u>Szubak v. Secretary of Health and Human</u>

<u>Servs.</u>, 745 F.2d 831, 833 (3d Cir. 1984). Under sentence 6 of section 405(g) the

evidence must be "new" and "material" and a claimant must show "good cause" for

not having incorporated the evidence into the administrative record. <u>Id.</u> The Court

of Appeals for the Third Circuit explained that to be material "the new evidence

[must] relate to the time period for which benefits were denied, and that it not

concern evidence of a later—acquired disability or of the subsequent deterioration of the previously non—disabling condition." Id.  The items submitted to the Appeals Council o not meet this threshold for consideration and, consequently, do not provide a basis for remand.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  Therefore, the court will affirm the decision of the Commissioner.

An appropriate order will be entered.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        March 18, 2014